J-S06014-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.H.G., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.A.L., MOTHER | No. 813 EDA 2014 |

Appeal from the Decree entered February 5, 2014,
in the Court of Common Pleas of Philadelphia County, Family
Court, at No(s): CP-51-AP000222-2013; FID # 51-FN-002419-2011

| | |
|---|---|
| IN THE INTEREST OF: M.C.G., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.A.L., MOTHER | No. 814 EDA 2014 |

Appeal from the Decree entered February 5, 2014,
in the Court of Common Pleas of Philadelphia County, Family
Court, at No(s): CP-51-AP000223-2013; FID # 51-FN-002419-2011

BEFORE:  BENDER, P.J.E., LAZARUS, and FITZGERALD*, JJ.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MARCH 05, 2015**

L.A.L. ("Mother") appeals from the decrees entered February 5, 2014, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated Mother's parental rights to her minor son, M.H.G., born in November of 2008, and to her minor daughter, M.C.G., born in March of 2010 (collectively, "the Children").  We affirm.[1]

---

* Former Justice specially assigned to the Superior Court.

[1] The parental rights of the Children's father, A.G. ("Father"), were terminated by separate decrees entered on the same date.  Father is not a party to the instant appeal.

This matter first came to the attention of the Philadelphia Department of Human Services ("DHS") on May 14, 2011, when the Children's older brother and sister were discovered wandering the streets by Philadelphia police officers.[2]  N.T., 2/5/2014, at 8, 17-18.  The older siblings reported to police that they ran away from home because Mother and Father were beating them.  *Id.* at 9.  At the time the older siblings were found, they had bruises on their backs, and appeared emaciated.  *Id.* at 15.  The Children's older sister also had bruises on her legs, and was wearing a one-piece infant's undershirt, despite being four years old.  *Id.*  The Children's older brother had a black eye and "dark circles under his other eye."  *Id.*  An investigation of the home was conducted, and garbage was discovered on the floor of each room "to about calf level."  *Id.* at 9-10.  The Children and their older siblings were removed from the care of Mother and Father, and were adjudicated dependent on June 8, 2011.  *Id.* at 18-19.  In September of 2011, the Children's older sister revealed that she had also been sexually abused by Father.  *Id.* at 21-22.  Both Mother and Father faced criminal charges as a result of these events.  *Id.* at 17, 30, 44; DHS Exhibits 1 and 2.

On April 16, 2013, DHS filed petitions to involuntarily terminate the parental rights of Mother to the Children.  A termination hearing was held on

_____

[2] The Children are the children of Mother and Father.  The Children's older siblings are Father's children from a prior relationship, and are not related to Mother.  N.T., 2/5/2014, at 7.

- 2 -

February 5, 2014, during which the trial court heard the testimony of Mother, Father, and DHS social worker service manager, Ms. Sakinah Jones. That same day, the court entered its decrees terminating Mother's parental rights. Mother timely filed notices of appeal on March 7, 2014, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated Mother's appeals *sua sponte* on April 21, 2014.

Mother now raises the following issues for our review.

1. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother] under 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother] under 23 Pa.C.S.A. § 2511(a)(2)?

3. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother] under 23 Pa.C.S.A. § 2511(a)(5)?

4. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother] under 23 Pa.C.S.A. § 2511(a)(8)?

5. Whether the [t]rial [c]ourt erred by finding, under 23 Pa.C.S.A. § 2511(b), that termination of [Mother's] parental rights [would] best serve the [C]hildren's developmental, physical and emotional needs and welfare?

Mother's Brief at 5 (lower court answers omitted).

We consider Mother's claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

- 3 -

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8) and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here,

we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence

necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the trial court concluded that Mother's parental rights should be terminated in light of, *inter alia*, her inability to provide a safe environment for the Children. Trial Court Opinion, 7/10/2014, at 4 (unnumbered pages). The court emphasized that Mother has refused to acknowledge the role she played in the abuse suffered by the Children's older siblings, and that Mother has refused to believe that Father engaged in sexual abuse. *Id.* at 4-5. Mother argues that the trial court erred by terminating her rights because she visited with the Children regularly, and because she worked diligently to achieve her Family Service Plan ("FSP") goals by obtaining housing, by obtaining employment, and by completing parenting classes with a domestic violence component. Mother's Brief at 8-10.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by terminating Mother's parental

rights. During the termination hearing Ms. Sakinah Jones, the DHS social worker service manager, testified concerning the circumstances leading to the placement of the Children in foster care. N.T., 2/5/2014, at 8-18. Ms. Jones stated that, at the time the older siblings were discovered, they "had visible bruises over their bodies. They were emaciated. Their stomachs were expanded. They appeared malnourished, . . . and after medical examinations all of that was confirmed." *Id.* at 10. Ms. Jones also discussed the allegations of sexual abuse made by the Children's older sister. *Id.* at 22. Ms. Jones noted that the older sister, who was "five or six" at the time, exhibited inappropriate sexual behaviors. *Id.* While the older sister no longer acts out sexually, Ms. Jones explained that she still exhibits behaviors that her therapists attribute to sexual victimization, such as hoarding food, eating items that are not food, and urinating on herself. *Id.* at 33.

Ms. Jones further testified concerning Mother's FSP goals. Specifically, Mother's goals were to be compliant with the services offered by the Achieving Reunification Center ("ARC"). *Id.* at 20. At ARC, Mother was to receive a parenting capacity evaluation, visitation with the Children, financial workshop assistance, and assistance with employment, housing, and parenting. *Id.* Domestic violence therapy also was incorporated into Mother's goals. *Id.* Ms. Jones conceded that Mother has completed all of her FSP goals. *Id.* at 23. Despite this success, Ms. Jones expressed

concern that Mother would be unable to keep the Children safe if they were returned to her care. *Id.* at 25-26, 43, 47. Ms. Jones explained that Mother does not view Father as a threat to the Children, and does not think that he is capable of physical or sexual abuse. *Id.* at 23-25, 28-29, 43, 52.

Additionally, Ms. Jones testified that she believed that Mother and Father still have a relationship. *Id.* at 52. Ms. Jones conceded that Mother and Father are no longer living together. *Id.* However, she noted that Mother attends her supervised visits at DHS with Father "at times." *Id.* at 27. Mother's unsupervised community visits were converted into supervised community visits out of concern that Father would be present. *Id.* Ms. Jones noted that Mother's visits with the Children "appear to be appropriate in a supervised setting." *Id.* at 53.

Father testified that the bruises on the Children's older siblings resulted from their tendency to "play roughly." *Id.* at 56. Father also asserted that some of the bruises may have been caused by the older siblings' maternal grandmother. *Id.* at 57. Father admitted to spanking his children in the past, and he claimed that the Children's older brother got a black eye after his face hit the side of a bath tub while being spanked. *Id.* at 57-58. However, Father denied directly causing any injuries. *Id.* at 63-64. Father also insisted that the Children's older siblings had been eating three meals a day while in his care. *Id.* at 58.

Mother testified that the Children spent most of their time with Father prior to being removed from the home, because she "worked a lot." *Id.* at 66. Mother claimed that she did not discipline the Children, but stated that she would "pop [the] hands" of the Children's older siblings. *Id.* at 66. Mother stated that she always made sure that there was food in the house, and that the Children's older siblings had the sort of food that they wanted. *Id.* at 68.

Mother further testified that she was originally scheduled to attend her visits at DHS on Fridays, but that the visits were switched to Mondays because "my Fridays were getting messed up and because they didn't want nobody in the center on Fridays." *Id.* at 69-71. According to Mother, Father was already visiting with the Children on Mondays, so she began attending Father's visits. *Id.* Mother stated that she arrives at the visits at the same time as Father because they take the same bus. *Id.* at 71. Mother stated that she keeps a "very close eye" on Father, and that, with respect to the Children's older siblings, "I do feel there is something wrong and that some help should have been given." *Id.* at 71. Mother testified that she "always had good visits" with the Children. *Id.* at 69.

Accordingly, the testimony presented at the termination hearing establishes that the Children's older siblings suffered severe physical and sexual abuse at the hands of Father. Mother refuses to admit that Father abused the Children's older siblings, and refuses to admit her own role in

this abuse. Thus, despite Mother's success in achieving her FSP goals, the record supports the trial court's conclusion that she is incapable of parenting the Children, as she cannot provide a safe environment. Mother's parental incapacity has left the Children without essential parental care or control, and it was reasonable for the court to determine that Mother will not, or cannot, remedy this incapacity. No relief is due.

Next, we consider whether termination was proper under Section 2511(b). The requisite analysis is as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court has explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, 71 A.3d at 267. "Common sense dictates that courts considering termination must also consider whether the children are in a

- 10 -

pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Here, the trial court concluded that it would be in the Children's best interests for Mother's parental rights to be terminated, and that the Children would not suffer irreparable harm. Trial Court Opinion, 7/10/2014, at 5-6 (unnumbered pages). The court emphasizes that the Children are bonded with their foster parent, and that the foster parent provides a loving, stable, and positive environment for the Children. *Id.* at 5. Mother argues that the court lacked clear and convincing evidence to terminate her parental rights under Section 2511(b) because, "[t]here was little or no testimony regarding lack of bond between [Mother] and her children." Mother's Brief at 11.

Again, we conclude that the record supports the trial court's decision to terminate Mother's parental rights. Ms. Jones testified that, at the time of the termination hearing, the Children had been in care for approximately 32 months. N.T., 2/5/2014, at 19. Currently, the Children are in a pre-adoptive foster home separate from their older siblings. *Id.* at 30-31, 36. At the time of the hearing, the Children had been residing there for about

two years, and were "doing very well." *Id.* at 32, 36. The Children refer to their foster mother as "Mother," and together they enjoy a parent/child bond. *Id.* at 37, 39. The foster mother ensures that all of the Children's needs are being met. *Id.* at 40. The foster mother also takes the Children on vacation, which included a trip to Disney World during the summer prior to the termination hearing. *Id.* at 37. Ms. Jones stated that "[i]t wouldn't be good" for the Children to remain in foster care any longer, as this would deny them permanency. *Id.* at 41-42. Instead, Ms. Jones opined that it would be in the Children's best interests to be adopted. *Id.* at 42, 45. She also opined that it would not be detrimental to the Children to terminate Mother's parental rights. *Id.* at 46.

Thus, the evidence supports the trial court's determination that it would be in the Children's best interest if Mother's parental rights were terminated. While there was little, if any, evidence presented concerning the bond between Mother and the Children, the record suggests that a bond is unlikely, as M.H.G. was removed from Mother's care when he was only about two and a half years old, and M.C.G. was removed when she was only about one year old. To the extent that Mother and the Children are bonded, that bond is clearly outweighed in the instant case by the Children's need for safety, and by the strong parent/child bond that they share with their foster mother. We conclude that Mother is not entitled to relief.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights pursuant to Sections 2511(a)(2) and (b), we affirm the decrees of the trial court.

Decrees affirmed.

Judge Lazarus joins this memorandum.

Justice Fitzgerald files a dissenting statement.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/5/2015